IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 1999 Session

## STATE OF TENNESSEE v. FRANKIE E. CASTEEL

**Appeal as of Right from the Criminal Court for Hamilton County**
**No. 215403-215404 & 215405      Douglas A. Meyer, Judge**

---

**No. E1999-00076-CCA-R3-CD**
**April 5, 2001**

---

Following a jury trial, the defendant was convicted of the first-degree murders of Richard Mason, Kenneth Griffith and Earl Smock in the Hamilton County Criminal Court, Douglas A. Myer, J., and the defendant appealed.  The Court holds (1) that the trial court's failure to follow statutory procedures before admitting evidence that the defendant had committed prior bad acts was harmless error; (2) evidence that the defendant had threatened trespassers was properly admitted; (3) the evidence was sufficient to convict the defendant; (4) failure to swear-in the jury prior to voir dire was at most harmless error where the jury was impaneled in another county and sworn in there; (5) the trial court did not abuse its discretion in refusing to allow the defendant to present alternative perpetrator evidence when that evidence was too far removed in time and place to connect it to the murders; (6) the trial court's failure to suppress evidence found on the defendant's property was proper because the evidence was seized during a search for the victims; (7) testimony about the contents of incriminating letters and newspaper articles was necessary to explain the defendant's attempt to destroy them; (8) the trial court properly allowed the state to cross examine the defendant about items seized from his home; but (9) the admission of five hours of an extremely prejudicial conversation between the defendant, his wife and his mistress in order to allow the jury to hear one adoptive admission was reversible error, especially when (10) the state relied on the unfairly prejudicial portion of the conversation when arguing its case to the jury in order to highlight the defendant's character.  Reversed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, J., and DAVID H. WELLES, J., joined.

Phillip C. Lawrence; Mark D. Hackett; Don W. Poole, Chattanooga, Tennessee, for the appellant, Frankie E. Casteel.

Paul G. Summers, Attorney General & Reporter; Erik W. Daab, Assistant Attorney General, Nashville, Tennessee; William Cox, District Attorney General; C. Leland David, Special Prosecutor, Chattanooga, Tennessee, for the appellee, State of Tennessee.

## STATEMENT OF FACTS

On the afternoon of July 9, 1988, Kenneth Griffith and Earl Smock, two members of the same Air Force Squadron, were on weekend leave visiting Mr. Griffith's father-in-law Richard Mason at Mr. Mason's home in Hamilton County. The three men decided to ride four-wheeled all-terrain vehicles ("ATVs") to the "blue-hole," a local swimming area on Signal Mountain. In order to make the trip, Mr. Mason borrowed an ATV from his friend and neighbor, Stanley Nixon. The trio never returned.

The defendant had recently bought property near the blue hole. On the afternoon of the disappearance, Vince Brown was helping a friend back a moving van out onto a narrow mountain road and had to stop traffic in order to back the truck out of a driveway. He stopped the defendant driving a muddy Jeep Scrambler; the defendant's wife was also in the jeep. Mr. Brown and the defendant got into a conversation, and the defendant told Mr. Brown that he and his wife were going camping that weekend. Then the defendant left. Later that evening, between 6:00 p.m. and 8:00 p.m., Mr. Brown heard a rapid succession of gunshots coming from near the defendant's land.

William Wiggins, one of the defendant's neighbors, also heard a series of gunshots coming from the direction of the defendant's property on July 9, 1988. Between 7:30 p.m. and 8:30 p.m., Mr. Wiggins heard between five (5) and eight (8) shots, all of which were fired within about ten (10) seconds of each other. Sometime later that night, Mildred Hines saw a jeep near Sawyer Road with one or two ATVs in the back. Also on July 9, 1988, Pam O'Neal was camping on property that was near the defendant's. That evening she heard ATVs cross her property. Shortly after that, she heard gunshots. Around 2:00 a.m. the next morning, Ms. O'Neal woke up and decided to go home. As she and her husband were leaving, they saw someone driving a Jeep near Sawyer Road, the area where the ATVs were ultimately found. Jerry and Donna Anderson were in the area where the bodies were ultimately discovered on the night of July 9, 1988 and the early morning of July 10, 1988. They were looking for their son, who was supposedly camping in that area. Some time before 1:30 a.m. July 10, 1988, Jerry and Donna Anderson saw a jeep that was "loaded down" with weight in the back. They also said there was a tarp in the jeep, but when pressed, both Mr. And Mrs. Anderson explained that by "tarp" they meant the canvas top of the jeep. They identified the jeep to the police and identified the defendant's son, Donnie Casteel, as the driver. However, at trial, Donnie Casteel testified that he worked until 11:00 p.m. on July 9, 1988, and that he went to his grandfather's house after that to go to bed. His grandfather confirmed his story.

Several others also thought a jeep was in the area that night. Janice Hall lived near Sawyer Road, and heard a large-tired vehicle passing her home several times between 3:00 a.m. and 4:00 a.m. on July 10, 1988. Later that morning at around 6:00 a.m., she saw a female driving the defendant's jeep with a dog in the back. Hershell Green, a neighbor of the defendant's, heard what he believed to be the defendant's jeep on Sawyer Road at around 5:00 a.m. James Walling, who lived on Sawyer Road, saw the defendant's jeep driving in the area at about 6:15 a.m. He remembered the defendant's headlights were off, and daylight was just breaking.

The next day, John Lines observed a woman washing blood out of the back of a jeep at a local car wash. Mr. Lines asked the woman whether it was blood, and the woman replied that she had just taken a pig to the slaughterhouse. Because slaughterhouses are normally closed on Sundays, Mr. Lines found the woman's answer suspicious so he wrote down the license plate number. Later, Mr. Lines saw the defendant driving a jeep, and Mr. Lines checked the defendant's license plate. The number matched that of the license plate he saw at the car wash.

Sunday morning, July 10, 1988 a search party was organized to find the victims. Officer Larry Sneed of the Hamilton County Sheriff's Department responded to a call and found three ATVs dumped in an illegal dumpsite. Two of those ATVs were covered in blood. Bone chips were recovered from one of the ATVs. These were later found to be pieces of a skull that had been hit by a bullet. Police began referring to this area as "Crime Scene I." After finding out that the ATVs had been found, Lee Griffith, one of the victims' brother, was driving home to tell his mother about the news when his vehicle began having trouble. He stopped a jeep, coincidentally driven by the defendant, and asked for a ride. The defendant gave Mr. Griffith a ride, and Mr. Griffith noticed that the jeep was wet in the back. Mr. Griffith thought that the water in the jeep was unusual because it had not rained recently.

On Monday, July 11, 1988, the search party began searching the "Helican Road," which was more of a trail that crossed the defendant's property and led to the blue hole.[1] As the party began to search the Helican Road, they arrived at the "gate," in actuality an area where a gate used to be. They noticed that the area around the gate had been manicured, or cleaned so much that it looked unusual. There, the search party found spots of blood and what would later be identified as brain tissue. A more thorough search uncovered a pocketknife belonging to one of the victims and, outside the manicured area, large pools of blood. A police dog later found more blood in the area. Police eventually called this area "Crime Scene II."

Following their discoveries, the search party continued searching the area around the gate. Less than a mile from the gate, the party searched the defendant's campsite. In the fire pit and around the campsite, the search party found burnt, blue plastic and a metal grommet. Police collected the substance. At trial, a witness testified that he had seen the defendant with a blue tarp in the back of his jeep the day of the murders.

Portia McDowell lived between twelve (12) and fourteen (14) miles away from the blue hole, on Big Fork Road. On Monday, July 11, 1988, Ms. McDowell was taking her customary walk along Big Fork Road. As usual, she passed an illegal dump site on the side of the road. On this walk, however, she noticed something different. The dump site had been cleaned, and a terrible odor emanated from the dump. Ms. McDowell told her husband, Burnie McDowell, about the dump. Mr. McDowell went to look at the dump on Wednesday, July 13, 1988. He noticed a horrible smell and buzzing flies. When Mr. McDowell investigated, he found the victims' bodies. Police were notified, and this area became known as "Crime Scene III."

Dr. Frank King, the Hamilton County Medical Examiner, performed autopsies on the bodies. He found that the skull fragments that had been discovered at Crime Scene II matched the skull of

---

[1] The Helican Road turned off of a larger road, which was paved, and went up a hill. 2.2 miles later, the road passed the area called "the gate". Less than a mile from that gate, the road led to the defendant's property, and then to power-lines. After that, the road descended down a hill to the blue hole.

Kenneth Griffith. Mr. Griffith died from a shotgun blast to the head which left a portion of his head missing. Richard Mason also died from a shotgun blast, but Mr. Mason was shot in the chest. Earl Smock also died from shotgun blasts. Mr. Smock was shot twice, once with "birdshot," or smaller pellets, and once with "buckshot," or larger pellets.

On Monday, July 11, 1988, Detective Sneed asked all property owners in the area to come to the area that the police were searching. The defendant came to the area that afternoon. Detective Sneed asked to see the defendant's vehicle, which was parked at a friend's house. Detectives went with the defendant to see the jeep, and the defendant gave detectives permission to search the jeep. Inside the jeep, detectives found a "logbook" that belonged to the defendant. Inside the book, the defendant had recorded the details of several encounters that he had had with trespassers, including most of the trespassers' names, telephone numbers and license plate numbers. The detective asked the defendant if he could have the book, and the defendant gave his permission. The detectives then asked the defendant whether he owned a shotgun, and the defendant said that he did. The defendant then gave the detectives permission to borrow the gun, and the detectives went to the defendant's house to retrieve it. Ballistics tests performed on the shell fragments and wadding from the scene indicated that the gun may or may not have fired the fatal shots.

Although the defendant remained a suspect, he was not charged until years later. Before the defendant was charged, in August of 1996, Marie Hill, an old friend of the defendant's, began having an affair with him. After the affair began, Ms. Hill received two anonymous letters that accused the defendant of committing the murders. The letters also contained newspaper clippings about the murders. At trial, Suzie Casteel, the defendant's wife, testified that she wrote the letters in an effort to sabotage the defendant's affair, but that the defendant was really innocent. Not long after the affair began, Ms. Hill allowed the police to install listening devices on her phone lines and in her house. On October 12, 1996, the defendant's wife came to Ms. Hill's house and confronted the defendant and Ms. Hill. That confrontation turned into a five-hour conversation between the defendant, his wife and his mistress. During trial, the court played a tape of the entire conversation for the jury.

Police executed a search warrant of the defendant's residence in order to find the anonymous letter that the defendant had taken from Ms. Hill. While searching for the letters, Police seized forty-four (44) items, including a shotgun and ammunition. The defendant was finally charged with the murders on April 15, 1997. The defendant filed a motion to change venue due to the amount of publicity in the case, and the court granted the motion. The jury was selected in Loudon County and brought to Hamilton County for the trial. Before the trial, the defendant moved to exclude any evidence of the defendant's prior confrontations with trespassers, but the court denied the motion. At trial, eighteen witnesses testified to prior confrontations that they had with the defendant when they came on or near the defendant's property.

The defendant maintained, both before and during trial, that he had nothing to do with the murders. He testified that he was camping on his property near Crime Scene II on the night of July 9, 1988. He testified that he and his wife went to the blue hole that afternoon and that they did not return to the campsite until after 10:00 p.m. The defendant testified that he and his wife merely went to sleep that night, and that they did not hear anything unusual.

The defendant was convicted on all counts. He appeals that conviction here.

## PRIOR ACTS

The state presented eighteen witnesses, all of whom testified about prior encounters with the defendant. Specifically, Terry Mills, Jeff Mann, David Mosteller, Derrek Belk, Michael Killingsworth, DeAnn Kennedy, Vince Brown, Donald Jones, Tom Clark, Judith Lowrey, Melton Lowrey, John Savor, James Perry, Gary McDowell, Paul Meeks, Johnathon Ewton, Mike Dantzler, and Steve Craig all testified about encounters that they had with the defendant.[2] In eight of those cases, the court did not hold any hearing outside the presence of the jury to determine whether the testimony complied with the requirements of Rule 404 of the Tennessee Rules of Evidence before the witnesses testified. The court did hold a jury-out hearing for three of the witnesses but neglected to state on the record the reasons for admitting the evidence. In the remaining cases, the court held a jury-out hearing and stated the reasons for its ruling on the record. The defendant argues that the court impermissibly ignored the mandates of Tenn. R. Evid. 404(b), and that even if the court substantially complied with the procedural requirements of the rule, the danger of unfair prejudice resulting from each witness's testimony outweighed the testimony's probative value.

Evidence that an accused has committed some other crime or bad act independent of that for which he is charged is generally inadmissible, even though it may be a crime or act of the same character as that for which the defendant is on trial. Tenn. R. Evid. 404(b); State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993), cert denied, 510 U.S. 1215, 114 S. Ct. 1339, 127 L. Ed. 2d 687 (1994). However, if evidence that a defendant has committed an act separate and apart from the one for which the defendant is on trial is relevant to some material matter at issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. Tenn. R. Evid. 404(b); Howell, 868 S.W.2d at 254. Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Commission Comments.

By its very nature, evidence that the defendant has committed a bad act other than that for which he is on trial carries some risk of unfairly prejudicing the defendant. In recognition of this risk, Rule 404(b) establishes special procedures which must be followed before evidence of prior bad acts may be admitted. See Tenn. R. Evid. 404(b), Advisory Committee Comments. The procedures which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

---

[2]Mark Sively also testified about a prior encounter with the defendant, but his testimony concerned statements, not acts of the defendant. Accordingly, his statements are analyzed in the following section.

Tenn. R. Evid. 404(b). Finally, the court must find that the evidence is clear and convincing that the defendant committed the other act. Id., Advisory Commission Comments; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). In this case, a thorough review requires analysis of each witness in turn:

Terry Mills: The trial court held a jury-out hearing to determine the substance of the witness's testimony. At the hearing, Mr. Mills testified that, on the day of the murders, he and his friend Jeff Mann were driving two vehicles to the blue hole to go swimming. Before they reached the blue hole, they saw the defendant walking toward them with a shotgun. Mr. Mills testified that the defendant appeared angry, that he pointed the gun at Mr. Mills, and told Mr. Mills that trespassers were not allowed on the defendant's property. The defendant then escorted the pair to his nearby campsite and made them record in his logbook their names and the types of vehicles they drove. After that, Mr. Mills and Mr. Mann talked to the defendant for a short time, and then left. Following that hearing, the court ruled that it found the evidence relevant to a material issue other than character, namely "the defendant's state of mind," and that the probative value of the testimony was not outweighed by the danger of unfair prejudice. The court then allowed the witness to testify.

Jeff Mann: Mr. Mann was with Mr. Mills when the above encounter occurred. Thus, despite the defendant's objection, the court allowed Mr. Mann to testify without holding a jury-out hearing. The court reasoned that, because it had already heard one witness's account of the encounter, there was no need to hear another before the jury did.

David Mosteller: The court held a jury-out hearing, at which Mr. Mosteller testified that on June 5, 1988, over one month before the murders, he and two friends, Alan Barnes and Derek Belk, were driving to the blue hole to go swimming. Before they reached the blue hole, they were stopped by the defendant. The defendant approached Mr. Mosteller's vehicle, laid the end of a shotgun inside the passenger window and told the men to stay off of his property or he would shoot them. The court held that the evidence was relevant to prove the defendant's motive to defend his property, and that the probative value of the evidence was not outweighed by any prejudicial effect. The court then asked whether the state intended to present other witnesses that would testify about this encounter, and the state responded that Derek Belk would also testify about this incident. The court then held "[s]o it'd be the same [ruling] for Mr. Belk and [defense counsel] can note an exception for Mr. Belk also." Then, Mr. Mosteller testified.

Derek Belk: As noted above, the court ruled, sua sponte, that Mr. Belk's testimony was admissable before Mr. Mosteller testified. Thus, the court allowed Mr. Belk to testify about the above encounter without first holding a hearing.

Michael Killingsworth and DeAnn Kennedy: Before Mr. Killingsworth or Ms. Kennedy testified, the following colloquy occurred:

Mr. Poole (defense counsel): Your honor, I think we're getting into another group of –

Mr. Cox (prosecutor): We are.

Mr. Poole: I really think that –

-6-

The Court: What's the basis of [t]his? What will he say?

Mr. Cox: It's another incident.

The Court: I mean, what is it about though?

Mr. Cox: Another incident with the shotgun.

The Court: I mean, [about] what will he testify? What will he say?

Mr. Cox: He'll say he was coming down the road, stopped, two vehicles, and he and a bunch of others were threatened with a shotgun.

The Court: But nothing – in other words, it's basically the same except a different date?

Mr. Cox: Different date.

The Court: Okay, I don't need to hear it. Again, y'all [defense counsel] can note an exception, because the testimony will be the same, of the same nature as the other witnesses.

Mr. Poole: Okay. Now, we're up here now, Your Honor, so there are several of these 404(b)s. You're saying you're going to rule the same way on all of them?

The Court: Yeah, because as I said, unless, like on this one, it may be different, the one you set out in your motion, Steve Craig. Steve Craig must be different because y'all set him out by name.

Mr. Poole: Well, but that was even a different, you know, that was a hearsay statement made to prove that he was going to start shooting people. These are actual, we say, bad acts or crimes that are a different situation here.

Mr. Lawrence (defense attorney): I think the distinction, Judge, was that not only on some of these do you have the act of pointing the gun, but you have this statement as well, and by this motion we included Steve Craig and others to whom statements were alleged to have been made about shootings.

Mr. Davis (special prosecutor): Just for procedural purposes, this is the last incident of encounters we're going to do at this time. We're going to have, this is Michael Killingsworth and DeAnn Kennedy, and then move into the actual events.

The Court: Okay, All right.

Mr. Poole: So you're going to call two of them now?

Mr. Davis: Yeah, Michael and DeAnn.

The Court: And these are together?

Mr. Davis: Right.

The Court: So again, for the same reason I gave on the last witnesses, I'll deny your motion.

Mr. Poole: It's not necessary to have a hearing outside the presence of the jury?

The Court: No.

Following that exchange, Michael Killingsworth and Deann Kennedy both testified that, on June 11th, 1988, they, along with several others, drove two vehicles to the blue hole to go swimming. However, before they reached the blue hole, the defendant, armed with a shotgun, stopped them and told them they were trespassing. They both also testified that the defendant laid the shotgun inside the window of the truck and cocked it. Finally, they both remembered the defendant telling them that they "were playing a dangerous game," and Mr. Killingsworth remembered the defendant following that statement by saying that "somebody is going to get hurt." After being asked if the defendant had made any statements regarding trespassers, Mr. Killingsworth testified that the defendant "said he would kill if he had to."

Vince Brown: Mr. Brown testified that, on July 9, 1988, the day of the murders, he saw the defendant and the defendant's wife in a Jeep Scrambler, and that the jeep was noticeably muddy. The defendant told Mr. Brown that he was going camping on Signal Mountain that weekend. Mr. Brown then testified that later that night he was at a friend's house, which was less than a mile from the defendant's property, and he heard gunshots which sounded like they came from a shotgun. Mr. Brown then saw the defendant two days later and noticed that the defendant's jeep was clean. Following that testimony, the prosecutor notified the court at a bench conference that he intended to ask Mr. Brown about a prior encounter that Mr. Brown had when he trespassed on the defendant's property. The defense objected, and the court overruled the objection. Then, Mr. Brown testified that, on April 17, 1988, he and his cousin were driving a truck to the blue hole, and they encountered the defendant while en route. The defendant had a gun in his hands, and questioned Mr. Brown and Mr. Brown's cousin about their reasons for trespassing. At some point, the defendant recognized Mr. Brown's cousin, and the tone of the encounter became more friendly. Then, the defendant told Mr. Brown and his cousin that if they would write their names in the defendant's logbook, he might let them go hunting on his property at a later time.

Donald Jones: The court held a jury-out hearing at which Donald Jones testified that he and his wife, along with his friend Tom Clark and Tom Clark's wife, all went to the blue hole to go camping for the July 4th weekend. However, before they reached the blue hole, the group was stopped by the defendant's wife. The defendant then called his wife over a two-way radio and told

her to keep the members of the party where they were. The defendant then arrived with a gun and asked Mr. Jones and the rest of the party for their names and license plate numbers. When Mr. Jones explained that he wanted to camp at the blue hole, the defendant replied that he would not allow them to camp there, but that they should camp at Big Forks, another camping area. He then gave Mr. Jones directions to Big Forks. Following the hearing, the court held that the offered testimony was admissible, but did not explain its reasoning.

Tom Clark: At a jury-out hearing, Tom Clark also testified about the encounter described by Donald Jones. Mr. Clark emphasized that the defendant was very irate and "waiving his gun around." He also testified that the defendant gave the party directions to Big Forks. The court ruled that the testimony was admissible, but again did not explain its reasoning.

Judith Ann Lowery: At a jury-out hearing, Ms. Lowery testified that she, her husband, their children and several friends went swimming at the blue hole in June or July of 1988. While they were there, the defendant approached the party with a shotgun. He threatened to use the gun if necessary, and he pointed the gun at Ms. Lowery's husband. He then escorted the party back to his campsite and took down their names and license plate numbers. The court did not rule on the admissibility of the testimony until after the next witness testified.

Melton B. Lowery, Jr: At a jury-out hearing, Mr. Lowery, the husband of the previous witness, testified about the incident that his wife had just testified about. Without giving its reasoning, the court ruled that both witnesses could testify. After being pressed by defense counsel, the court stated that both Mr. and Mrs. Lowery's testimony was relevant to the material issue motive, and that the probative value of the testimony was not outweighed by the danger of unfair prejudice.

John Savor: Before Mr. Savor testified, the following colloquy occurred:

Mr. Cox: This is another encounter, two witnesses. I hate to keep sending the jury out, in and out, but I don't know what else to do if y'all want to hear him.

The Court: Have you heard his statement? Have you read his statement, the one that's going to testify?

Mr. Lawrence: Yes.

The Court: Okay. And do you have the same objection?

Mr. Poole: Yes, sir.

Mr. Lawrence: Yes, sir.

The Court: Do you need a jury-out hearing? The court doesn't if it's not going to be any different than the other.

Mr. Poole: If we could stipulate –

Mr. Cox: The statement?

Mr. Poole: Stipulate his statement, and again, once again, we will argue it's a violation of 404(b).

The Court: Okay. You can preserve that, your exception to my ruling.

Mr. Lawrence: We might put it a little bit more explicitly on the record maybe at a break or something, if we can do that.

The Court: Okay. Sure.

Mr. Savor then testified in front of the jury that, on June 16th, 1988, he and seven other friends drove a jeep and a truck to the blue hole to go swimming. They left the truck parked at the power lines, but drove the jeep to the blue hole. After they swam for several hours, the party left the blue hole. Mr. Savor drove six people back in the jeep, while two of the men walked back to the truck ahead of the jeep. Mr. Savor then saw the defendant, who had a shotgun, detain the two men who had been walking. Mr. Savor drove his jeep to where the defendant had detained the two men. The defendant then made everyone get out of the jeep and stand in a line, and he told all of them to keep their hands where he could see them. The defendant appeared irate, and he made everyone write their names down in his book. He then told the witness that he was tired of people driving through his back yard.

James Perry: Over the defendant's objection and without a jury-out hearing or a ruling, the court allowed Mr. Perry to testify to the events that Mr. Savor had just described.

Gary McDowell: Without any objection or jury-out hearing, Mr. McDowell testified that, on May 15, 1988, he and his wife were riding horses near the blue hole when they accidentally happened upon the defendant at his campsite. The defendant appeared perturbed and complained about trespassers. The defendant specifically said he was irritated by certain individuals, including "Mason," a name identical to the last name of one of the eventual murder victims. The defendant said he was "going to make believers" out of the individuals that were irritating him. After the defendant recorded the names of Mr. McDowell and his wife in his book, the defendant then made them leave his property.

Paul Anthony Meeks: At a jury-out hearing, the witness testified that he rode his wife's motorcycle toward the blue hole on July 4th 1988. As Mr. Meeks neared the gate area, he saw the defendant, the defendant's wife and two other people with their backs to the witness. The witness knew he was trespassing, so he attempted to turn around before he was noticed. The defendant and his wife noticed Mr. Meeks, however. While Mrs. Casteel aimed a shotgun at Mr. Meeks' face, the defendant asked Mr. Meeks if he was stupid, or if he could read the no trespassing signs. The defendant then said he was going to make sure that Mr. Meeks did not come back. After hearing the testimony, the court held that the testimony was relevant to prove the defendant's motive, and that the probative value of the evidence was not outweighed by any prejudicial effect.

Johnathon Ewton: At a jury-out hearing, Mr. Ewton testified that he rode a motorcycle and his friend, Michael Dantzler, drove a jeep near the power lines sometime in April, 1988. While riding his motorcycle ahead of Mr. Dantzler's jeep, Mr. Ewton saw the defendant step out of the woods holding a pistol. The defendant yelled "hold it," but Mr. Ewton rode away. The defendant then apparently stopped Mr. Dantzler for a brief time, but Mr. Ewton stayed hidden from the

defendant. The defendant then chased Mr. Ewton, but Mr. Ewton escaped. The court did not rule on the admissibility of the testimony until after the next witness was heard.

Michael Dantzler: At a jury-out hearing, Mr. Dantzler testified about the incident about which Mr. Ewton had just testified; specifically, Mr. Dantzler testified that, some time in April, 1988, he was driving a jeep and following Mr. Ewton as Mr. Ewton rode a motorcycle near the power lines. At some point, Mr. Dantzler saw the defendant step out of the woods and point a gun at Mr. Ewton. Mr. Dantzler then saw the defendant fire a shot over Mr. Ewton's head. Then, the defendant turned around and pointed the gun at Mr. Dantzler's jeep, causing Mr. Dantzler to stop. The defendant then told Mr. Dantzler that he had been having problems with trespassers, and that if the problems did not abate, the defendant would have to start shooting people.

After the hearings, the court ruled that both Mr. Ewton's and Mr. Dantzler's testimony was relevant to the material issue of motive, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

Steve Craig: At a jury-out hearing, Mr. Craig testified that on May 1, 1988, he, along with a friend, went swimming at the blue hole. The defendant, who was carrying a rifle, calmly approached Mr. Craig that day and told him and his friend that he would allow them to swim if they picked up trash while they were there. Then, on July 6th 1988, three days before the murders, Mr. Craig called the defendant to ask permission to go swimming. The defendant gave Mr. Craig permission to swim, and Mr. Craig drove to the blue hole. While he was en route, Mr. Craig saw the defendant. They struck up a conversation, and the defendant told Mr. Craig "people like you driving trucks I generally don't have a problem with, but people riding them goddam four-wheelers, I'll shoot one of them bastards if I have to." The court held the statement admissible, but it is unclear if the court found that the encounter constituted a prior act.[3]

It is clear from the above summaries that the trial court did not, in all cases, comply with the procedural requirements envisioned by rule 404(b). The state urges that the court substantially complied with the rule because, in the cases in which the court neglected to voir dire the witnesses, the court "knew the substance of the testimony of each witness, and found that the testimony was admissible for purposes other than character and was more probative than prejudicial." That is not the case. The court had already heard testimony about encounters witnessed by Jeff Mann, and Derek Belk, because those witnesses were each the second witness to testify about the specific encounter that each witnessed. However, the court also neglected to hold a hearing to determine the substance of the testimony of Michael Killingsworth, DeAnn Kennedy, Vince Brown, John Savor, James Perry or Gary McDowell, even though no previous witness had testified about those encounters. Moreover, the record does not indicate that the court found that any encounter occurred by clear and convincing evidence as required by Parton, 694 S.W.2d at 303. The procedural requirements of rule 404(b) are not to be taken lightly. "Not only does the admission of irrelevant bad acts evidence have a high potential for prejudice, the testimony required to establish, as well as rebut, the prior act can substantially lengthen a trial . . . . [Thus, r]ule 404(b) should be followed

---

[3]After the hearing, the defendant argued that Mr. Craig's testimony constituted inadmissable hearsay, because it was not relevant to the defendant's state of mind. The state responded that the testimony was not offered to prove the defendant's state of mind, but was instead relevant to prove the defendant's intent, motive, and identity, and thus an admissible prior act. Although the court held that the testimony was admissible, no reason was given.

closely to avoid prejudicing the rights of the accused and to maintain the focus of the trial." State v. Bigbee, 885 S.W.2d 797, 806 (Tenn. 1994). In short, the procedural requirements of the rule exist, at least in part, because prior act evidence is so potentially damaging that the judge should hear the evidence and rule on its admissibility before the jury hears it.

However, in this case, any error committed by the trial court was harmless, because all of the testimony was admissible. Initially, we agree with the trial court that the testimony of Terry Mills, David Mosteller, Judith Lowery, Melton Lowery, Paul Meeks, Johnathon Ewton and Michael Dantzler, the witnesses for whom the trial court held jury-out hearings and stated its reasoning for admitting the testimony on the record, was relevant to prove the defendant's motive to protect his land and the land surrounding it. Although the state was not required to prove the defendant's motive as an element of first-degree murder, the state is required to prove identity, i.e., that the defendant, and not someone else, committed the crime. Proof of the defendant's motive is useful in establishing the defendant's identity. McLean v. State, 527 S.W.2d 76, 83-84 (Tenn. 1975). In this case, the defendant claimed that he did not commit the murders; thus, his identity was at issue. Consequently, proof of the defendant's motive was proper.

We also find that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The evidence, that the defendant confronted and sometimes threatened trespassers or perceived trespassers, was highly probative of the defendant's motive. Furthermore, there was little danger of unfair prejudice. The Tennessee Supreme Court has emphasized that "unfair prejudice" is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998)(citations omitted) cert. denied,119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999). Nothing in the testimony at issue suggests an improper basis for convicting the defendant. Finally, we find that the offered testimony proved that the encounters occurred by clear and convincing evidence.

Although Jeff Mann, Derek Belk, Michael Killingsworth, DeAnn Kennedy, Vince Brown, John Savor, James Perry and Gary McDowell were all allowed to testify without a jury-out hearing, we elect to analyze these witnesses' testimony as contained in the record before us, rather than remand for a 404(b) hearing to resolve the issue. State v. Hoyt, 928 S.W.2d 935, 945 (Tenn. Crim. App. 1995). Jeff Mann's testimony concerned the same encounter about which Terry Mills had just testified, and Mr. Mann's testimony was essentially identical to that of Mr. Mills. Similarly, Mr. Belk's testimony did not differ substantially from Mr. Mosteller's. Furthermore, although the trial court did not hear Michael Killingsworth's or DeAnn Kennedy's testimony before they each testified to the jury about an encounter with the defendant, the facts of the defendant's encounter with Mr. Killingsworth and Ms. Kennedy were as probative on the issue of motive as the encounters on which the court did rule, and no more prejudicial. Mr. Brown's testimony was also probative on the issue of motive, and substantially less prejudicial than the others. Although the court did not hold a jury-out hearing to determine the substance of John Savor's testimony, the court offered to hold a jury-out hearing, but the defense agreed not to, and merely objected to the court's ruling that the testimony was admissible. James Perry's testimony concerned the same encounter and was essentially identical to Mr. Savor's. Gary McDowell's testimony, that the defendant was "going to make a believer out of Mason" was substantially more prejudicial than the others, but not unfairly so, and it was more probative. In short, we find that all of the testimony was admissible to prove the defendant's motive, that its probative value outweighed the danger of unfair prejudice, and that there was clear

and convincing evidence that the encounters occurred. Thus, any error committed by the trial court in allowing the other encounter witnesses to testify without first hearing the testimony out of the presence of the jury was harmless, because their testimony would have been admitted anyway.

The trial court conducted jury-out hearings for Donald Jones, Tom Clark and Steve Craig in accordance with Tenn. R. Evid. 404(b), and found all three men's testimony admissible without stating its findings on the record. We note that Tenn. R. Evid. 404(b)(2) only requires the court to state its findings on the record "upon request." In these instances, the defendant did not explicitly request that the court state its findings on the record. In any event, we find the testimony of Donald Jones, Tom Clark and Steve Craig was admissible to prove the defendant's motive, that the probative value of their testimony outweighed the danger of unfair prejudice, and that there was clear and convincing evidence that the encounters occurred.

## **THREATS**

The defendant also complains that the trial court erred by allowing several witnesses to testify that the defendant either threatened the testifying witness or that the defendant threatened someone else in the presence of the testifying witness. Initially, we note that the defendant's statements to David Mosteller, Derek Belk, Michael Killingsworth, DeAnn Kennedy, Melton Lowery, Judith Lowery, Michael Dantzler, Gary McDowell and Steve Craig were properly admitted in order to prove the defendant's motive under Tenn. R. Evid. 404(b), as noted above. However, another witness, Mark Sivley, testified about statements that the defendant made before the murders. Mark Sivley, a property owner in the area, testified that he heard complaints that the defendant had been forcing people off his property. Mr. Sivley went to visit the defendant to investigate the complaints approximately one week before the murders. He saw the defendant at the gate area sitting in his jeep. They spoke to each other, and the defendant showed Mr. Sivley his log book. When Mr. Sivley asked if the defendant had been having problems with trespassers, the defendant replied "not as long as I have this" while holding his shotgun.

Initially, we note that the defendant's statements were admissions, and are therefore admissible as an exception to the hearsay rule. Tenn. R. Evid. 803(1.2)(A). Furthermore, the testimony, that the defendant had animosity toward trespassers in general and, more specifically, that he regarded his shotgun as a safeguard against trespassers, was clearly relevant to show the defendant's premeditation and motive. State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Given the relevance of the statements, we find that the danger of unfair prejudice did not substantially outweigh their probative value. Tenn. R. Evid. 403.

The defendant argues that State v. Hicks 835 S.W.2d 32 (Tenn. Crim. App. 1992) placed a temporal limitation on such statements, i.e., that too much time had passed between the statements and the crime for the statements to demonstrate the defendant's state of mind. However, no such temporal limitation exists. In State v. Smith, the Tennessee Supreme Court held that given the relevance of relevance of threats made by the defendant to the victim between two and five months before the killings, any evidence of remoteness went to the weight of the evidence, not its admissibility. 868 S.W.2d 561, 575 (Tenn. 1993) cert. denied, 513 U.S. 960, 115 S. Ct. 417, 130 L. Ed. 2d 333 (1994); see also State v. Haun, 695 S.W.2d 546, 550 (Tenn. Crim. App. 1985) (holding that while "a lapse of time may, of course, affect [the relevance of evidence], it is the rational connection between events, not the temporal one, that determines whether the evidence has

probative value.") We view this case to be similar to Smith. Accordingly, we hold that the trial court correctly admitted the testimony about these statements.

## SUFFICIENCY

Next, the defendant argues that the evidence was insufficient to support a conviction for first-degree murder. When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding of the trier of fact of guilt beyond a reasonable doubt." T.R.A.P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (Tenn. 1956) cert. denied, 352 U.S. 845, 77 S. Ct. 39, 1 L. Ed. 2d 49 (1956). This court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Herrod, 754 S.W.2d 627, 632 (Tenn. Crim. App. 1988).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record and the inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. Matthews, 805 S.W.2d at 780.

First-degree murder, at the time of the killings, was defined as "[e]very murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious and premeditated killing." Tenn. Code Ann. § 39-2-202(a)(Supp. 1988)(repealed 1989). Without evidence that the killing was willful, malicious, premeditated, and deliberate, this court cannot uphold a conviction for first degree murder. State v. West, 844 S.W.2d 144, 147-48 (Tenn. 1992); Everett v. State, 528 S.W.2d 25, 26 (Tenn. 1975). In this appeal, the defendant claims that the state failed to prove that he was the perpetrator, and that the state failed to prove malice, premeditation and deliberation.

Although the state's case was entirely circumstantial, the state presented ample evidence that the defendant was the perpetrator. Circumstantial evidence may certainly be sufficient to prove the defendant's identity. State v. Darnell, 905 S.W.2d 953, 961 (Tenn. Crim. App. 1995). In this case no witnesses saw anyone kill the victims, but the defendant admits he was camping at his campsite, which was less than a mile from the murder site, when the murders occurred. He had repeatedly told trespassers that he would use his gun if necessary, and specifically mentioned ATVs and "Mason" as targets of his scorn. Furthermore, the killings were committed with a shotgun in an area that the

defendant patrolled with a shotgun. On the day of the murders, the defendant was seen with a blue tarp that the state theorized was used to cover the bodies, and burnt remains of a blue tarp were found in the defendant's campsite after the murders. The defendant was seen transporting ATVs in his jeep the night of the murders. Several witnesses heard a jeep driving on the mountain in the middle of the night. Other witnesses heard gunshots coming from the defendant's property the night of the killings. Another witness saw a woman washing blood out of the back of the defendant's jeep the day after the murders. Finally, the defendant's shotgun was consistent with the gun used in the killings. In short, the jury could have concluded that the defendant committed the murders.

There was also clearly evidence of malice. Malice can be inferred from the use of a shotgun. State v. Shelton, 854 S.W.2d 116, 120 (Tenn. Crim. App. 1992). The defendant also argues that, even if the evidence was sufficient for a jury to conclude that he committed the murders and did so with malice, there was no evidence from which the jury could infer his specific intent. Premeditation requires proof that the defendant had a previously formed design or intent to kill and acted after exercising reflection or judgment. State v. Brown, 836 S.W.2d 530 (Tenn. 1992); State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999). Deliberation "requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.' " Brown, 836 S.W.2d at 540. The elements of premeditation and deliberation are jury questions that may be established by proof of the circumstances surrounding the killing. Id. at 539. There are several factors which tend to support the existence of these elements which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) cert. denied, 523 U.S. 1083, 118 S. Ct. 1536, 140 L. Ed. 2d 686, (1998); Brown, 836 S.W.2d at 541-42; West, 844 S.W.2d at 148; Rosa, 996 S.W.2d at 837.

In this case, the jury could have concluded that the defendant planned to kill the victims and did so following deliberation. The defendant's previous confrontations demonstrated his motive to protect his property, especially because the defendant had confronted a "trespasser" at the gate, where the murders ultimately took place. Indeed, the defendant had made earlier statements that he would shoot someone on an ATV and that he would "make [a] believer" out of someone named "Mason." Once, the defendant had even shot at a trespasser and chased him from his property. The evidence also showed that, prior to the shootings, someone had advised the defendant to purchase buckshot to protect his property, and buckshot was used in the killings. Finally, the evidence showed that three victims were shot, the bodies were driven far away, and that the scene of the murders was carefully "manicured." We find this evidence sufficient to prove that the defendant willfully and maliciously killed the victims with premeditation and deliberation.


## VOIR DIRE

The defendant next claims that the trial court erred by failing to swear the prospective jurors prior to the voir dire examination. Although this case was tried in Hamilton County, the jury pool was selected in Loudon County due to the pre-trial publicity. After jury selection, the defendant moved to strike the jury pool because the jurors were not sworn in Hamilton County. The court then questioned the jury and discovered that they had been sworn in Loudon County when they were

selected to be a part of the jury pool, and that they still considered themselves to be under oath when they were voir dired in Hamilton County.

Rule 24(a) of the Tennessee Rules of Criminal Procedure provides, in relevant part, "[t]he court shall cause the prospective jurors to be sworn or affirmed to answer truthfully the questions they will be asked during the selection process . . . ." Tenn. R. Crim. P. 24(a). The rule is "calculated to guarantee that right of the defendant to trial by a fair and unbiased jury." State v. Claybrook, 736 S.W.2d 95, 100 (Tenn. 1987). The purpose of the rule was not violated here, because the jurors were sworn before voir dire, and they considered themselves under oath when they were questioned. Nothing in the record or in the briefs suggests that swearing the jurors in Loudon County rather than in Hamilton County worked to the prejudice of the defendant. This issue is without merit.

## PHOTOGRAPHS

The defendant next objects that the trial court erred by allowing the state to introduce into evidence two photographs of the victims' decomposing bodies. The defendant claims that the photographs were unfairly prejudicial and were not necessary to prove the state's case.

The Tennessee Supreme Court has held that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." State v. Banks, 564 S.W.2d 947, 950-951 (Tenn. 1978)(citing People v. Jenko, 410 Ill. 478, 102 N.E.2d 783 (1951)). On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Banks, 564 S.W.2d at 951 (citing Milam v. Commonwealth, 275 S.W.2d 921 (Ky. 1955)).

In this case, Stanley Nixon testified that the search party found a large amount of blood and what appeared to be tissue on a leaf near the defendant's property. Thus, the photograph showing that one of the victim's skulls was not intact was admissible to illustrate that the tissue found near the defendant's property was from the victim's brain. The photographs were also admissible in order to illustrate Doctor King's testimony. See State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994)(stating that trial court did not abuse its discretion when it admitted a photograph of a corpse to illustrate the testimony of a police detective); see also Smith, 868 S.W.2d at 576 (holding that trial court did not abuse its discretion in allowing autopsy photograph of victim during guilt phase of trial in part to illustrate Medical Examiner's testimony).

Finally, we have viewed the photographs and conclude that while they were unpleasant, the probative value of the photographs was not substantially outweighed by danger of unfair prejudice. Accordingly, we hold that the trial court did not abuse its discretion when it admitted the photographs into evidence.

## ALTERNATIVE PERPETRATOR EVIDENCE

The defendant claims that the trial court erred by excluding evidence that established that a third party had motive to kill the victims. Specifically, the defendant claims the trial court erred by excluding testimony that Cecil Hickman, a caretaker of property that was near the defendant's property, had confronted and/or assaulted several people near the area where the murders occurred. The proffered evidence was in the form of testimony by four witnesses. Stanley Nixon, Ted Ott,

James Walling and Darwin Goodwin all testified in jury-out hearings that they had been the victims of assaults or confrontations for trespassing on or near the property for which Mr. Hickman was responsible.

We have previously held that "[w]here . . . a defendant attempts to raise a third party defense, he is allowed to present proof tending to show that another had the motive and opportunity to have committed the offense. Where the proof is consistent with this hypothesis, it is to be considered by the jury." State v. Kilburn, 782 S.W.2d 199, 204 (Tenn. Crim. App. 1989). The evidence by which the guilt of a third party is to be established must conform to all the rules regulating the admission of evidence. State v. McAlister, 751 S.W.2d 436, 439 (Tenn. Crim. App. 1987). So, for example, the evidence to establish that someone other than the defendant is the guilty party must qualify as relevant if it were to be presented in the trial of the third party. Hensley v. State, 28 Tenn. 243 (1848). Furthermore, the evidence offered as to the commission of the crime by a third party must be limited to such facts as are inconsistent with the defendant's guilt, and to such facts as raise a reasonable inference of innocence. Id.

In our view, the proffered evidence would not have been admissible in a trial of Mr. Hickman. Although, as stated above, evidence that establishes motive is relevant, the evidence of Mr. Hickman's bad acts, unlike those of the defendant, do not rise to that level because any such bad acts presented were either by an unidentified individual or too far removed in time and place to be relevant.

For example, Stanley Nixon testified in a jury-out hearing that he and Richard Mason, one of the victims in this case, encountered Cecil Hickman and Mr. Hickman's sons. Mr. Hickman and his sons apparently thought Mr. Nixon and Mr. Mason were trespassing, and either Mr. Hickman or one of his sons shot a shotgun into the air three times. The encounters occurred at least seven months before the murders and about two miles from the murder site. Furthermore, Mr. Nixon was not sure who fired the shot. The court held that the evidence was not "strong enough" to connect Mr. Hickman to the murders.

Similarly, Ted Ott testified at a jury-out hearing that, while riding an ATV on Signal Mountain, he encountered someone with a shotgun who fired the gun at him. Although the incident occurred only about one-half mile from the defendant's property, it occurred about a year before the murders. Moreover, Mr. Ott could not identify the individual that shot the weapon. The court held that the evidence was not admissible because the defendant had not connected it in any way to the murders.

Next James Walling testified at a jury-out hearing that he had several encounters with Mr. Hickman before the murders. He also said that Mr. Hickman "patrolled" land in that area, and that sometimes Mr. Hickman carried a shotgun. When Mr. Hickman caught Mr. Walling trespassing several times, Mr. Hickman took Mr. Walling's name and let him go. Mr. Walling testified that Mr. Hickman could be hostile during these encounters. However, Mr. Walling could not remember if the encounters occurred months or even years before the murders. The court held that the evidence was excluded because of its remoteness.

Finally, Darwin Gooden testified at a jury-out hearing that he encountered someone near the blue hole who aimed a shotgun at him and told him he was trespassing. The incident took place between nine and ten months before the murders, and the witness could not identify the person that

aimed the gun at him. Indeed, he could not exclude the defendant as a possiblity. The court held the evidence inadmissible.

None of the evidence offered by the defendant at trial was sufficiently connected to Mr. Hickman and close enough in time and place for us to find that the trial court abused its discretion by finding that the proffered evidence was irrelevant. This issue is without merit.

### SUPPRESSION

The defendant next contends that the trial court erred by allowing the state to introduce testimony that police found the charred remains of a blue tarp and a grommet in a fire pit at the defendant's campsite, because the police searched the defendant's campsite without a warrant. The state responds that the evidence was properly admitted because (1) the evidence was found in an "open field" which did not require a warrant, and (2) the police were acting under exigent circumstances. We will consider each argument in turn.

The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend IV. Similarly, Article I, Section 7 of the Tennessee Constitution guarantees, "That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ." Tenn. Const. art. I, § 7. Thus, unless the search falls within a specifically established and well-delineated exception to the warrant requirement, a search conducted without a warrant is per se unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854 (1973) (citations omitted).

Since Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), the touchstone of Fourth Amendment analysis has been the question whether a person has a "constitutionally protected reasonable expectation of privacy." Katz, 389 U.S. at 360 (Harlan, J., concurring). The Fourth Amendment does not protect the merely subjective expectation of privacy, but only those "expectation[s] that society is prepared to recognize as 'reasonable.' " Id. at 361.

In Oliver v. United States, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984), the Supreme Court found that society is not prepared to recognize a landowner's expectation of privacy in that part of his land that is neither the dwelling nor the curtilege, thus reaffirming the "open fields" doctrine first announced in Hester v. United States, 265 U.S. 57, 44 S. Ct. 445, 68 L. Ed. 898 (1924). In Oliver, the Court specifically rejected applying the doctrine on a case-by-case basis, citing concerns that such an ad hoc approach would prove unworkable for law enforcement. 466 U.S. at 181. Furthermore, the fact that the land was surrounded by "No Trespassing" signs was immaterial in Oliver: "[c]ertainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post "No Trespassing" signs." Id. at 183 n.13. Accordingly, we can find no Fourth Amendment violation.

However, the Tennessee Constitution is somewhat more protective of private property rights than the U.S. Constitution in this context. Article I, Section 7 of the Tennessee Constitution protects "possessions" from unreasonable searches and seizures. In Welch v. State, the Tennessee Supreme Court stated that the word "possessions" was placed in the Constitution to limit searches of real and personal property which was in actual possession and occupancy. 154 Tenn. 60, 289 S.W. 510, 511 (1926). The Court noted that "actual possession" is usually evidenced by occupation, substantial

enclosure, cultivation or use. Welch, 289 S.W. at 511. The Court held, however, that the word "possessions" would not include "wild or waste lands, or other lands that were unoccupied." Id; see also State v. Lakin, 588 S.W.2d 544, 549 (Tenn. 1979)(reiterating the Tennessee Constitution's more restrictive view of an "open field").

In this case, there was no question that the campsite was on the defendant's property. Furthermore, although not adduced at the jury-out hearing on the motion to suppress, several witnesses testified at trial that the defendant had posted "No Trespassing" signs around his property. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that the entire trial record may be considered when determining the correctness of a trial court's ruling on a motion to suppress.) As noted above, nearly half of the state's witnesses testified that the defendant was, indeed, trying to occupy the land and keep strangers from entering his property. Accordingly, we hold that although the land did not contain a fixed dwelling and was not cultivated for farm use, the defendant's occupation of the land was substantial enough to convince us that this was not "wild and unoccupied land." Cf. State v. Doelman, 620 S.W.2d 96, 99 (Tenn. Crim. App. 1981)(upholding the warrantless seizure of evidence on wild unoccupied land that was not posted by the owner).

The evidence was nevertheless admissible, however, because the police discovered the remains of the tarp while they were still searching for the victims. The police did not know whether the victims were alive, injured, or dead. Indeed, the search parties had discovered blood and brain tissue less than a mile from the campsite before they found the remains of the blue tarp in the fire pit. "The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency." Howard v. State, 599 S.W.2d 280, 282 (Tenn. Crim. App. 1980)(quoting Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963)). Accordingly, any warrantless search of the wooded area was conducted under such exigent circumstances that a warrant was not required.

## HEARSAY

During her direct testimony, Marie Hill testified that she began having an affair with the defendant in the summer of 1996, eight years after the murders. She also testified that some time in August, 1996, she received a letter that accused the defendant of committing the Signal Mountain murders, and that the envelope also contained newspaper clippings about the murders. The defendant objected to the introduction of the letter, and the court held a jury-out hearing to determine the substance of the letters. Ms. Hill testified that she told the defendant about the letter after she received it. She stated that the defendant responded by explaining that there had been murders near some property that he owned and that the police questioned him about the incident. Ms. Hill testified that, some time after that, she received a second letter that accused the defendant of committing the crime. She showed it to the defendant, and he denied any involvement in the murders. She then gave both of the letters to the defendant. Some time after that, she asked the defendant to return the letters to her. The defendant initially returned the letters to Ms. Hill, but he took one of the letters back when Ms. Hill left the room and replaced the letter with a blank sheet of paper. Ms. Hill discovered the substitution some time later that day, and she called the defendant to question him about the missing letter. Although he initially denied taking the letter, he later admitted to Ms. Hill that he not only took the missing letter, but burned it as well, because it contained information that could be harmful to him.

The court held that Ms. Hill could testify about the contents of the letter and the defendant's reaction to them, but the basis of the ruling was unclear.[4] On appeal, the defendant argues that Ms. Hill's testimony about the contents of the letters and newspaper articles constituted inadmissible hearsay, and, even if the letters and newspaper articles were admitted only to show the defendant's reaction, they still should have been inadmissible because the unfair prejudice resulting from the testimony substantially outweighed its probative value. The state responds that the testimony about the letters and accompanying newspaper articles was not offered for its truth, but was instead offered to show the defendant's reaction to the letters. Regarding the testimony's prejudicial value, the state asserts that "the minimal discussion of the contents of the letters was necessary to establish the reasoning behind the defendant's obsession with them."

While the trial court's ruling is unclear, evidence that would normally be hearsay may, of course, be admitted for a non-hearsay purpose, such as the evidence's effect on the listener, provided the evidence is relevant and its probative value was not substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 401, 403, 801. Such was the case here. The evidence, that the defendant stole, and later burned, a letter which implicated him in the murders, was clearly relevant

[4]After the court held a jury-out hearing to determine the substance of Ms. Hill's testimony, the court indicated that Ms. Hill would be allowed to testify about the letters and the newspaper articles. Then, the following colloquy occurred :

Mr. Poole [defense counsel]: Wait a second. What is the ruling now, that [the state] is going to put all this in or not? I don't understand.

The Court: I said that he could.

Mr. Poole: Because it's admissible evidence?

The Court: Yes, if that's what she discussed with him.

Mr. Poole: Your honor, there has to be some exception or some reason. This is introduced for the truth of what's in the newspaper articles?

The Court: No. No, it would not be. It would only be introduced to show that this is what she discussed with him, not for the truth of the articles.

Mr. Poole: And what about the letter itself, the same ruling?

The Court: There is no letter.

Mr. Davis (Special Prosecutor): The letter's been burned.

The Court: She testified –

Mr. Poole: She can testify as to what was in the letter?

The Court: She can testify as to what she saw in the letter and discussed it with him.

Mr. Cox (District Attorney): And what he did and what his reaction was to it.

Mr. Poole: Your honor, what he did is not admissible for any reason or any purpose. That's not – the purpose of that is to try to say, well, this is some proof of something. It's not admissible.

The Court: No, it is admissible. Anything that your client did or said to this witness is admissible.

Mr. Poole: Anything he did or said to her?

The Court: Yeah, as long as it's relevant. Not if they discussed going to a movie or something, that wouldn't be relevant, but any discussion about the murders on Signal Mountain would be relevant.

Mr. Lawrence (Defense Attorney): Well, the point is that, you know, he, he specifically denied the veracity of anything in those newspaper clippings.

The Court: Right.

Mr Lawrence: And so that's not conduct that would come in under, you know, any basis that would make it an admission.

The Court: A trier of fact could determine that he makes tacit admissions against interest throughout that tape. It will be up to the jury what weight they give to that testimony, but anything a defendant says to anyone about a crime that that individual is charged with is admissible, anything at all he says to anyone.

to show evidence of the defendant's guilt.  See Hicks v. State, 533 S.W.2d 330, 334 (Tenn. Crim. App. 1975)(holding that "any attempt to suppress or destroy or conceal evidence is relevant as a circumstance from which guilt of an accused so acting may be inferred.").  The danger of unfair prejudice resulting from testimony about the anonymous letters and articles was not significant, particularly in light of Suzie Casteel's later testimony that she wrote the letters in order to break up the relationship between the defendant and Ms. Hill.

Finally, the defendant argues that the unfair prejudice resulting from the testimony was exacerbated by the trial court's failure to offer a limiting instruction.  If the defendant desired a limiting instruction, he should have moved the trial court to give such an instruction.  Tennessee Rule of Evidence 105 states: "[T]he court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."  Tenn. R. Evid. 105.  Thus the burden of triggering a request for a limiting instruction is upon the party who seeks or is entitled to the instruction.  The failure to request a limiting instruction results in the waiver of the issue.  Tenn. R. App. P. 36(a); State v. Gibson 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997).

## CROSS-EXAMINATION OF DEFENDANT

The defendant claims that he was improperly cross-examined regarding a shotgun and some ammunition that were illegally seized from his house in 1997, almost nine years after the murders. He claims that they were illegally seized because the shotgun and the ammunition were not listed in the warrant. During trial, the defendant claimed that, at the time of the murders, he did not own buckshot. The state then attempted to impeach the defendant using the shotgun and ammunition that was seized from his home in 1997.

The Tennessee Supreme Court has recently reiterated that when suppression of evidence seized pursuant to a valid warrant is challenged, the burden is upon the accused to prove by a preponderance of the evidence:  (1) the existence of a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized;  (2) the identity of the items sought to be suppressed;  and (3) the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant.  Henning, 975 S.W.2d at 298.  In this case, the defendant has not challenged the validity of the warrant itself, and we detect no defect.  Thus, the burden of proof was on the defendant to prove that the search itself was defective.

If, during a lawful search, police find items which are not specified in the warrant, but which are immediately apparent to be contraband, fruits of crime, instrumentalities of crime, or evidence of criminal conduct, their right to seize these items is governed by the plain view exception to the warrant requirement.  State v. Meeks, 867 S.W.2d 361, 373 (Tenn. Crim. App. 1993) (citations omitted), cert. denied, 510 U.S. 1168, 114 S. Ct. 1200, 127 L. Ed. 2d 548 (1994).  Here, the warrant itself authorized a search for letters.  Without other proof from the defendant, we must assume that a search for items as small as letters could uncover a shotgun and ammunition boxes in plain view.  Furthermore, it is clear that a shotgun and ammunition belonging to a suspect of a murder committed with a shotgun would have immediately appeared to be instrumentalities of that murder.

The shotgun and ammunition were also properly used for cross-examination.  Prior to the defendant's testimony, the Medical Examiner testified that the victims had been shot with a shotgun, and that two types of ammunition, birdshot and buckshot, had been used to shoot the victims.  On

cross-examination, the District Attorney asked the defendant whether, at the time of the murders, the defendant possessed birdshot and buckshot. The defendant replied that he only had birdshot at the time. The state then attempted to impeach the defendant by showing that the ammunition seized in the defendant's home was buckshot. Although the defendant claims that the impeachment was improper because the defendant bought the buckshot after the murders, that merely affected the weight, not the admissibility, of the evidence. Trial judges are empowered with great discretion regarding the trial process, including the scope of cross-examination, and that discretion will not be disturbed unless an abuse of discretion is found. State v. Williams, 929 S.W.2d 385, 389 (Tenn. Crim. App. 1996). Here, we find no such abuse of discretion.

## ADOPTIVE ADMISSIONS

The defendant next contends that the trial court erred by allowing the state to introduce audiotapes of a conversation between the defendant, his wife and his mistress. In her direct testimony, Ms. Hill testified that, shortly after she began having an affair with the defendant, she allowed the police to tape-record the conversations in her home. On October 12, 1996, the defendant and Ms. Hill were at Ms. Hill's home at approximately 2:30 a.m., when the defendant's wife, Suzie Casteel, came to the home. The defendant, his wife and his mistress then had a conversation that lasted approximately five (5) hours. During Ms. Hill's testimony, the state, over objection, introduced tapes of that conversation and played tapes of the entire conversation for the jury.[5] The defendant claims that the tapes should have been excluded because (1) they contain inadmissible hearsay, (2) they contain accounts of the defendant's prior bad acts, and (3) the prejudicial effect of the tapes substantially outweighed their probative value. In the alternative, the defendant argues that the tapes should have been redacted to eliminate the prejudicial statements.

The state responds that the tapes contain several statements by Suzie Casteel which implicate the defendant and were adopted by the defendant's responses or lack thereof. Since those statements constitute tacit admissions, argues the state, they are exceptions to the hearsay ban under Tennessee Rule of Evidence 803(1.2)(f) Specifically, the state points to the following exchange:

Suzie Casteel: I'm tired of her. I've stood by you for thirty years. I've stood by you through one of the worst things we could ever go through. I had myself drug down to the police station and fingerprinted because of what you've done.
Frank Casteel (to Ms. Hill): When did you call?

The state claims that this is a tacit admission, because the defendant certainly would have said "I didn't do anything" if he were innocent. Shortly after that statement, Ms. Casteel complained that the defendant had hit her, and the following conversation took place

Suzie Casteel: . . . You told me to shut up about something, and I said some things about her, and I told her I did, cause it made you mad, that's not why you hit me, it was the other thing that I was talking about that was the reason you hit me.

_____

[5]The state attempted to introduce transcripts of the taped conversation. After the court overruled the defendant's objection to the introduction of the transcripts, the court allowed the defendant to choose whether to play the tapes of the conversation to the jury or to have the witness read a transcript of the tapes aloud. The defendant chose to allow the tapes to be played.

Frank Casteel: What is your purpose here?  What are you doing?

Later, apparently referring to the same incident, Mrs. Casteel said "I did not . . . that's not the reason you got up from your chair and came over there, and did that, is because I wouldn't shut up about something else."  The state claims that the "other thing" that Mrs. Casteel referred to must have been the murders.

Later, Mrs. Casteel discusses spousal immunity:

> Mrs. Casteel: If somebody is going to do something to me, let them do it.  I've just got to the point, to where I just almost don't care.  It would almost be a blessing if somebody was to do something to me.  But see, that's what bothers me, I don't know why they hadn't been doing it to you, and I wondered why they weren't doing it to her, but then I figured, no, they want us to get a divorce, cause then they can use me to testify against you.  But after I told a person that I was not going to divorce you, that you were going to divorce me, I think that's when it went to her.  Because I told someone else that I was not going to divorce you.  That you were going to have to divorce me.

Here, the state claims that the defendant would have protested that spousal immunity was irrelevant if he was innocent.  Finally, toward the end of the conversation, Mrs. Casteel talked about the investigation of the murders:

> Suzie Casteel: Frankie, now honestly, I thought she may be setting you up, and like I said, if you go down, I go down, and I don't want to go down.

> Frank Casteel: What does that mean?

> Suzie Casteel: If they decide to pin that thing on you, however they try and do it, they are going to get me too.

> Frank Casteel: I think we are all too paranoid.  I think we need to quit.

Again, the state argues that the defendant would have denied responsibility for the murders if he was innocent.

It is well-settled that "when a statement is made in the presence and hearing of one accused of an offense and the statement tends to incriminate him, or is of an incriminating character, and such statement is not denied or in any way objected to by him, both the statement and the fact of his failure to deny it or make any response to it, is admissible against him as evidence of his acquiescence in its truth." Ledune v. State, 589 S.W.2d 936, 939 (Tenn. Crim. App. 1979)(citations omitted).  Before such tacit admissions are admissible, however, several requirements must be satisfied: (1) the party against whom the statement is offered must have heard and understood the other person's statement; (2) the subject matter must be within the knowledge of that party; (3) the party must have been able to physically communicate a clarification or disagreement; and (4) the

circumstances must have been such that the party would probably have responded if he or she disagreed with the statement. See Neil P. Cohen et al., Tennessee Law of Evidence § 803.(1.2)3, at 517 (3d ed.1995); Ledune, 589 S.W.2d at 939-40.

For example, in State v. Black, a murder suspect responded "huh?" after being told over the telephone that he should kill himself if he wanted to commit a murder-suicide. 815 S.W.2d 166, (Tenn. 1991). The trial court properly held that the defendant made a tacit admission because the record established that the statement of the accusor "identified the defendant as the target of an accusation, that the defendant knew well the reference being made, that the accusation was of an incriminating character, and that the accusation was not denied or objected to by the defendant" Id. at 177.

In this case, Mrs. Casteel's statement that "I've had myself drug down to the police station and fingerprinted for what you've done" is similar to the statement in Black. The statement identified the defendant as the target of the accusation, the defendant knew the reference being made, the accusation was incriminating, and the defendant did not deny the accusation or object to it. Thus, we agree with the trial court that this statement by Mrs. Casteel was adopted by the defendant.

The other statements, however, are not as clear. For example, when Mrs. Casteel says that the defendant hit her because of "the other thing," it is unclear to what she was referring. Although the state claims that "the other thing" must have been the murder, because "the defendant had two conflicts at that time, his affair and potential triple murder charges," we are not willing to presume that much. Similarly, when Mrs. Casteel discusses the possibility of testifying against her husband, he fails to respond. Although the state insists that, had the defendant been innocent, he would have responded that spousal immunity was irrelevant, we are not willing to find a tacit admission where there was no accusation. Finally, when Mrs. Casteel told her husband "if they decide to pin that thing on you, however they try to do it, they are going to get me too," the defendant did not object. Even if he was innocent, however, he was the subject of a murder investigation. The statement only implies that the defendant might be prosecuted for the crime, not that he committed it. Indeed, her statement just before that, "if you go down, I go down" sounded more like an accusation, and the defendant asked Mrs. Casteel what she meant.

In short, only the first statement should have been admissible as a tacit admission by the defendant. The other statements that the state points to were far too vague for the defendant to have adopted by silence. "[B]efore such admissions may be admitted in evidence, not only must a clear showing be made that the implicating accusation was made in a defendant's presence and clearly understood by him, but also, there must be a direct showing that the defendant was the target of the accusation." Ledune, 589 S.W.2d at 939-40. We find that only the first statement was a tacit admission and the rest of Mrs. Casteel's statements should have been excluded as hearsay.

The state also claims, alternatively, that the statements made by Mrs. Casteel were not hearsay because they were not offered for their truth. That argument fails too, however, because the statements only have probative value if they were offered for their truth and adopted by the defendant. Any other effect the statements may have had on the defendant's state of mind eight years after the murders is irrelevant.

The five-hours of tapes were also extremely prejudicial to the defendant. First, the entire conversation was between the defendant, his wife, and his mistress, and the overriding theme of the conversation was the defendant's adulterous affair with another woman. In fact, during the

conversation he repeatedly tells his wife that he is not in love with her anymore. Moreover, throughout the conversation Mrs. Casteel accused the defendant of abusing her. For example, at one point Mrs. Casteel said:

> But would you like to tell her what you did the night you kicked Donnie out of the house? That's the night you really let me have it. You want to talk about incidents that I have hit you, let's talk about all the incidents you have beat me up. And that night, that was a beating. That was not just hitting or slapping around. That was a beating.

The conversation was replete with statements about the defendant's previous violence toward his wife. Mrs. Casteel even says she ended a relationship with a man because she was scared of what the defendant would do to him. She also told Ms. Hill that the defendant was not a good father, saying "I mean, he hasn't contacted his children, he don't seem to care about them anymore." Later, Mrs. Casteel mentioned an incident where the defendant called a police officer a "pig," and the defendant replied "I call a lot of cops 'pigs' cause I think a lot of cops are 'pigs'." The inference that the tapes compel is that the defendant abused his wife, was a bad husband, was a bad father, and hated police officers.

The state claims that the prejudice resulting from the tapes was a regrettable necessity because the prejudicial statements were "interspersed throughout the accusations that the defendant committed the murders," and that "the conversation occurred as a result of an adulterous affair and accordingly was necessary to explain the context of the conversation." However, as noted above, there was only one adoptive admission in the entire five-hour conversation, and that accusation contained no unfairly prejudicial testimony. Furthermore, no context was necessary to understand the admissible adoptive admission. Indeed, Ms. Hill could have testified about the statement without ever referring to the other, more prejudicial statements.

Finally, we note that the trial court was not left without a remedy. Regarding the admission of tape-recorded conversations, the Tennessee Supreme Court has held that "any statement made by a nontestifying party to the conversation which tends to be prejudicial to the defendant must be redacted, unless admissible under some other rule of law." State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980); see also State v. Wilcoxson, 772 S.W.2d 33, 38 (Tenn. 1989)(holding that transcripts of conversations were admissible after being redacted significantly to minimize any indication that defendant was willing to engage in criminal activity unrelated to that for which he was on trial), cert. denied, 494 U.S. 1074, 110 S. Ct. 1798, 108 L. Ed. 2d 799 (1990); see also State v. Kimberly Greene, No. E1999-02200-CCA-R3CD, 2001 WL 112312, at *10 (Tenn. Crim. App. at Knoxville, Feb. 9, 2001)(discussing that, when faced with videotaped statements by the defendant that also contained references to numerous prior bad acts, "at least five options for handling the defendant's videotaped statements were available. The state could have made a redacted copy of the videotape that focused on the relevant portions of the interview; the state could have queued the tape to the relevant part of the interview and played only that portion for the jury; the state could have prepared a transcript of the relevant passages and offered that transcript as an exhibit; the state could have had the detective himself relate what the defendant told him during that interview, which was relevant to the case; or the state could have used the audiotape recording that was made, with the defendant's

knowledge, during the surreptitiously videotaped interview. The audiotaped statements were essentially free of the taint about which the defendant now complains. Any one of these options could have advanced the state's case and minimized the risk of a new trial."). The tapes in this case were not redacted in any way. In the absence of any such redaction, we find that the extreme prejudice resulting from a five-hour conversation that contained numerous references to irrelevant prior bad acts of the defendant substantially outweighed any probative value of one tacit admission.

We also cannot hold the error harmless. The state did not let the prejudicial evidence pass without comment, accepting, as it argues here, that the prejudicial impact was necessary in order to admit the tacit admission. Instead, the state highlighted the prejudicial portion of the tapes during closing arguments, as discussed below, in order to argue that the defendant was a man of bad character and must be convicted.

## CLOSING ARGUMENTS

The defendant next complains that the trial court erred by allowing the state to make improper closing arguments. Specifically, the defendant claims that the state improperly made reference to the defendant's character and that the state improperly told the jurors that, if they found that the defendant had lied on the stand, they must convict. In general, closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. Bigbee, 885 S.W.2d at 809. Argument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994). Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters properly in evidence at trial. Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).

In this case, the prosecutor made the following statement during the state's rebuttal closing argument:

> What do we know? We know a couple of things about Frank Casteel. We know he's a man of exceptional deception. Look at how he deceived his wife. We know he's a man of exceptional cruelty. Look how cruel he was to his wife, sitting there with his mistress, saying, "I love you, Marie; I don't love you, Suzie." Holding children at gunpoint, threatening them, them begging to be let go. What kind of man is this? A man of deception, a man of cruelty.

The defendant failed to object to this argument at trial. Therefore, this issue ordinarily would be waived. Tenn. R. App. P. 36(a). However, in light of our concern that the improper argument prevented the defendant from receiving a fair trial, we address this issue on the merits. See Tenn.R.Crim.P. 52(b). As noted above, although the tape of the defendant's conversation with his wife and his mistress had been admitted, the part of the conversation to which the prosecutor referred should not have been received in evidence because the danger of unfair prejudice substantially outweighed the evidence's probative value. Because we held that the admission of this evidence was erroneous, we also hold that it was error to allow argument regarding this evidence. State v. Hodge, 989 S.W.2d 717, 724 (Tenn. Crim. App. 1998).

In State v. Philpott, this court set out factors to be considered in making the determination whether a prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant. These factors are as follows:

1. the conduct complained of in light of the facts and circumstances of the case;

2. the curative measures undertaken;

3. the intent of the prosecutor in making the improper remarks;

4. the cumulative effect of the improper conduct and any other errors in the record; and,

5. the relative strength or weakness of the case.

882 S.W.2d 394, 408 (Tenn. Crim. App.1994) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). We must therefore consider each of these factors in turn to decide whether this error affected the result of the trial.

The argument, though based on evidence presented at trial, was based on evidence erroneously admitted. Moreover, compounding the trial court's error, the argument was an impermissible reference to the defendant's character because the defendant had not placed his character at issue and because the argument was not made in response to a defense argument. Gray v. State, 191 Tenn. 526, 235 S.W.2d 20, 21 (1950).

Furthermore, the only curative measure undertaken by the trial court was to instruct the jury that the arguments of counsel are not evidence according to the pattern jury instruction. This lack of curative instructions was perhaps the result of the defense's failure to object. However, in light of the trial court's erroneous admission of evidence regarding the tape-recorded conversation, any objection by the defense probably would have been overruled. The trial court did not instruct the jury that it should not consider this improper argument, leaving the impression that this argument was a valid consideration for the verdict.

Finally, although the record contains no evidence regarding the prosecutor's intent when he made the statement at issue, the cumulative effect of offering character evidence which was gleaned from unfairly prejudicial tape recordings in closing argument was substantial. This is especially true in this case, which involved no direct evidence. Judge, 539 S.W.2d at 346.

The defendant also argues that another argument made by the state during closing arguments was erroneously admitted by the court. Immediately following the statement outlined above, the prosecutor stated:

If you don't believe Frank Casteel lied to you yesterday, then turn him loose. Let him go.

And I believe, if I heard [defense counsel] correctly, he intimated that Mr. Casteel didn't lie to you. What's he talking about? Of course he lied to you. Do you remember the conversation where Gary McDowell says he mentioned that he was having trouble with an old timer, and it was Mason, and Joe Skinner, and somebody

else? What'd he say? Never happened, never had any conversation. What did he say about every encounter? Not, no, it didn't happen that way. No it never happened at all, they're lying, all these witnesses, these fourteen witnesses that he pointed the shotgun at came in here and testified as to what happened. He says no, that's all lies. Now, why? Why would he lie? Did he lie?

If you find he lied to you, he lied to you because he's guilty. The innocent have no reason to come in here, raise their hand to God and lie. Only the guilty do. If you find that Frank Casteel lied to you yesterday, then you must conclude that he's guilty.

The defendant objected at that point, and the trial court overruled the objection, stating "[the state] has the right to make that statement." The prosecutor continued:

I mean, [defense counsel] got up here and made a great argument, but it didn't have anything to do with what Frank Casteel said. Now, if [defense counsel] would be on trial here, I would expect you to acquit him. But that's nothing in reality to what happened yesterday on the stand with Frank Casteel. He lied to you and he lied to you because he's guilty and he's a murderer.

On appeal, the state argues that this statement was not an attempt to instruct the jury that it must find the defendant guilty of murder if it found that the defendant lied about a witness encounter. Instead, argues the state, the argument merely points out that the defendant lied about the encounters and lied when he denied committing the murders. The state argues that the closing statement merely pointed out that, as a matter of logic, if the jury found that the defendant lied about everything, including denying responsibility for the murders, it must conclude that the defendant was guilty.

The record, however, does not support the inference suggested by the state on appeal. The prosecutor only referred to the defendant's statements regarding his prior bad acts before insisting that the defendant's lies mandated a guilty verdict. Indeed, the statement "[i]f you find that Frank Casteel lied to you yesterday, then you must conclude that he's guilty" implies that the jury must find the defendant guilty if the defendant lied at all.

Applying the Philpott factors to the instant case, we find that the conduct complained of may have been less prejudicial if the evidence in this case had been stronger. Moreover, the court did not try to cure this error, or indeed, recognize it to be error. While this error, alone, might not have changed the outcome of the trial, it is the cumulative effect of all the errors that mandates reversal, especially in light of the relative weakness of the state's case. We are therefore of the opinion that these errors more probably than not affected the verdict in this case and that the defendant must be afforded a new trial as to all charges against him. Tenn. R. App. P. 36(b).

Accordingly, the judgement of the trial court is reversed and remanded so that the defendant may be afforded the opportunity for a new trial.

_____

JERRY L. SMITH, JUDGE